David A. Aronson, Appellee, v. Mutual Life Insurance Company of New York, Appellant.

Gen. No. 41,723.

Opinion filed January 19, 1942.

WINSTON, STRAWN & SHAW, of Chicago, for appellant; LOUIS W. DAWSON, of New York City, and GEORGE B. CHRISTENSEN and GERARD E. GRASHORN, both of Chicago, of counsel.

DAVID COHL, of Chicago, for appellee; SEYMOUR SCHEFFRES, of Chicago, of counsel.

MR. JUSTICE MATCHETT delivered the opinion of the court.

In a suit to recover disability benefits under an insurance policy there was trial by jury, a verdict for plaintiff for $485 with judgment thereon from which defendant appeals.

The insurance policy was delivered September 4, 1924. It was an ordinary life policy for $2,000 with a clause providing for disability benefits. This clause provided that upon due proof the insured had "become totally and permanently disabled by bodily injury or disease, so that he is, and will be, permanently, continuously and wholly prevented thereby from performing any work for compensation, gain or profit, and from following any gainful occupation," or if he suffers named disabilities (none of which are claimed here), the company would, during the continuance of the disability, waive payment of premiums and pay to the insured a monthly income at the rate of $10 for each $1,000 of the face amount of the policy with increasing ratio of 60 consecutive months.

Plaintiff's claim is for $65.40 for premiums paid under protest and $30 per month for 14 months of disability beginning December 1, 1938, and ending January 1, 1940.

As a matter of fact, for more than five years prior to December 1, 1938, defendant paid disability benefits to plaintiff because of his claim that he had been totally disabled by arthritis and a too rapid heart. On the last named date defendant discontinued payments.

Plaintiff began this suit January 9, 1940, with the result already stated. It is urged for reversal there were many errors, only one or two of which it will be necessary to consider since these are controlling.

At the close of all the evidence defendant moved for an instruction in its favor which was denied. The question of law was thus squarely raised whether plaintiff was entitled to recover, which, as we have said, is the controlling question. There is practically no conflict in the evidence.

Plaintiff is a widower fifty-two years of age; born in a foreign country; at about sixteen years of age came to this country; attended school; passed through the fourth grade; went into the sweater and knitting business; was industrious, working from nine to ten hours

a day; made rapid progress; went into the embroidery business for himself at the age of twenty-five. He did not do clerical work but operated the factory, fixing machines, making designs, etc. In 1927, he went into the dressmaking business with a corporation in which he owned 45 per cent of its stock. He was the boss; hired, fired and directed 25 to 27 girls operating sewing machines. He was consulted as to style, quantity and quality, etc., of dresses to be manufactured, and using an electric machine did the cutting himself. He repaired and purchased machines; was an officer of the corporation but never looked over the books. In 1931, his business was moved to Paducah, Kentucky. He was there about a month, leaving his family in Chicago; returned in March 1931, having sold out his interest. From March 1931, until 1937, he was in the hotel business.

His first claim for disability benefits was made in March 1931. He claimed a total and permanent disability from the month of March of that year because of arthritis. He was then, and at all times since has been, up and around. In 1933, he moved to a third floor apartment without an elevator; in 1938, to a similar building. Defendant for five years after March 1931, paid plaintiff disability benefits of $20 per month, and thereafter until December 1938, $30 per month.

Plaintiff's physician was Dr. Chaloupka. Plaintiff consulted him in 1929, complaining of backache and pain in his legs. For a time he wore a sacro-iliac belt and took heat treatments and massage. His doctor said he grew worse in 1931. His back caused more trouble and pains developed in his shoulders, knees and elbows. The doctor says there was some rigidity in the lower spine and muscle spasm in the back. His diagnosis was chronic osteo-arthritis.

In March 1937, plaintiff with a relative invested in an apartment hotel situated at 931 Leland avenue, Chicago. Plaintiff owned a half interest. The hotel

had 30 apartments; was located four or five blocks from where plaintiff resided. Plaintiff took title to the leasehold in the name of his brother-in-law, attorney, David Cohl. The bank account for the business was also carried in Cohl's name. Neither plaintiff nor Cohl drew a salary as they expected to receive their remuneration out of the profits.

About June 1938, defendant found out plaintiff had taken out a union card in the Janitors' Union under the name of "A. Aronson." Plaintiff was questioned about this, and in June defendant sent him to Dr. Walter S. Priest, a heart specialist; in November, to Dr. Edward W. Ryerson, an orthopedic surgeon. These physicians reported plaintiff was not disabled. Dr. Ryerson's opinion was plaintiff had chronic osteoarthritis of the spine and was not capable of performing work requiring physical labor but was able to perform clerical or supervisory work of almost any kind.

Since 1937, plaintiff has lived in two third-floor apartments without elevators, some distance from his place of business. He has been up and around at all times; rides on street cars and elevated trains; goes about the city and to doctors' offices in the Loop and other places; walks to and from the apartment hotel, some five or six blocks from his home. He is accustomed to arise about 6 o'clock in the morning. Each day he walks to a synagogue some two and one-half or three blocks from his residence; returns to his home; prepares and eats breakfast, and between 9 and 10 o'clock goes to the apartment hotel. Late in the afternoon each day, regardless of weather, plaintiff again goes to the synagogue. He testifies that when he first went into the apartment hotel business he did not go to the hotel regularly but did so after about six months. He arrives there about 9 o'clock in the morning; stays all day, sometimes for the evening; dresses in a regular business suit at times, at other times wears overalls. The hotel has no elevator. Plaintiff

carries on his activities from the basement to the third floor. He does not have any resting place in the hotel building. He has a power of attorney for Cohl and a bank account on which he is authorized to sign and draw checks. He walks to the Uptown State Bank on occasions and makes deposits there. Sometimes he is alone in the hotel office but claims he does not take care of the office. A tenant testifies that at times plaintiff collects the rents although this work is usually done by the housekeeper. A housekeeper and a janitor are employed in the hotel business. Plaintiff meets tradesmen, orders supplies such as soaps, paints, varnishes, hardware, etc., accepts deliveries of articles of merchandise, signs delivery tickets, supervises painting and decorating the building, assists in patching holes in the plaster and in doing so has carried plaster about on a piece of board and applied it to the wall with a trowel. He shellacked places in the woodwork and plaster; mixed up paint and painted the bottom part of one bathroom, a job that took him over an hour; washed walls as high as he could reach and delivered furniture about the apartment; carried paint buckets around; collected rents and gave receipts; repairs faucets; counts linens; operates a machine for stamping the hotel linen.

Dr. Chaloupka testifies the condition of plaintiff became worse in 1931, pains developing in the shoulders and knees, all the way up the back and in the elbows; that it was difficult for plaintiff to get around. His treatment consisted of a back support for a short time, light and heat treatments, massage and extraction of all plaintiff's teeth. Nevertheless, he says, plaintiff grew steadily worse. Dr. Chaloupka said there was no fixation of the spinal column except for muscle rigidity; that plaintiff had arthritis in his knees although there was no crepitus in moving the knee. He says that although in his opinion plaintiff has arthritis in his shoulders and elbows the X-rays do not

reveal it. He says plaintiff is able to move his hands and handle objects, to dress and undress perfectly, and get around the streets; that he could work an hour or so but no longer; that he does not believe plaintiff could engage in any occupation where he would have to work for five or six hours a day, because of his backache. He does not think plaintiff could walk all day but that he can walk for an hour or two at a time.

Dr. Greenspahn, an expert for the plaintiff, examined him in October 1931; took X-rays which were not produced. He was permitted over objection to testify to a physical and X-ray examination made just prior to the beginning of the trial November 18, 1940, which was nearly two years after the commencement of the suit and over 11 months after the close of the period involved in the suit. This doctor says that the tops of the hip bones were lined up in a straight position; that there was some kyphosis or backward curvature of the spine and tightening of the back muscles, crepitus in the right shoulder and in the knees; that there were arthritic deposits in the lower lumbar vertebrae and some roughing of the vertebra; that there was a slight sideward curvature of the spine; that the muscles outside of the spastic areas are a little flabby.

The expert physicians for defendant examined plaintiff at intervals from the year 1932 onward. They testify their examinations showed a man who had a rapid heart and was emotionally and nervously upset. There was evidence of an acute arthritis with foci of infection which might cause it. These ailments gradually diminished with the removal of the teeth, clearing up of the tonsils, etc. The weight became stable, and there were less complaints of pain. Plaintiff now weighs 136.

The provision as to disability in this contract is not unusual and it has often been construed by the courts. The provision is distinctly different from that

contained in some policies, which promise to insure against disability which prevents the insured from engaging *in his usual occupation.* This distinction was pointed out in *Buffo v. Metropolitan Life Ins. Co.,* 277 Ill. App. 366. This court said: ''.It appears that there are two general types of contracts of insurance of this nature, one of which provides for indemnity if the insured is disabled or prevented from engaging in any occupation and performing any work for compensation or profit, which policy is commonly known and designated as a total disability policy. The other kind provides for indemnity if the insured is disabled from transacting duties pertaining to the particular occupation in which the insured is then engaged. These are ordinarily styled occupational disability policies. It is generally recognized that there is a fundamental difference between these two classes of insurance and the risk that is assumed therein by the insurer. It therefore becomes necessary to revert to the provisions of the policy in question to determine which class the same comes under.''

This case followed *Sibley v. Travelers' Ins. Co. of Hartford, Conn.,* 275 Ill. App. 323, where insurance contracts to pay indemnity for disability were likewise classified and it was held proof of disability to follow the usual occupation of the insured would not alone justify a recovery. The *Sibley* case reviews the authorities. It is held in practically all of them that an insurance contract of this kind is construed liberally in favor of the insured, but that the court has no right to make a new contract for the parties. If there are terms of doubtful meaning or ambiguities, the doubt must be resolved in favor of the insured, but as the Supreme Court of the United States said in *Bergholm v. Peoria Life Ins. Co.,* 284 U. S. 489, this canon of construction ''furnishes no warrant for avoiding hard consequences by importing into a contract an ambigu-

ity which otherwise would not exist, or under the guise of construction, by forcing from plain words unusual and unnatural meanings.''

Other cases holding similar to the *Buffo* case are *Steffan v. Bankers Life Co. of Iowa,* 267 Ill. App. 248; *Wyckoff v. Metropolitan Life Ins. Co.,* 302 Ill. App. 241; *Russell v. New York Life Ins. Co.,* 305 Ill. App. 619 (Abst.).

Plaintiff cites *Victor v. Prudential Ins. Co. of America,* 284 Ill. App. 90; *Missouri State Life Ins. Co. v. Copas,* 265 Ill. App. 478; *Johnson v. Mutual Trust Life Ins. Co.,* 269 Ill. App. 471; *Wood v. Prudential Ins. Co. of America,* 271 Ill. App. 103; and *Grand Lodge Brotherhood of Locomotive Firemen v. Orrell,* 206 Ill. 208.

The *Victor* case was one where the total disability, as the evidence indicated, arose from incipient tuberculosis, heart disease, bronchitis, dementia praecox, deficient circulation, a deficient nervous condition and several other diseases. Trial was by jury and this court refused to disturb the verdict.

In the *Copas* case it was argued that a total disability clause, as here, should be construed to mean that plaintiff must be totally and permanently incapacitated for any purpose, and the court held this was not true. The opinion cites *Taylor v. Southern States Life Ins. Co.,* 106 S. C. 356, 91 S. E. 326, L. R. A. 1917C 910, to the contrary.

In the *Wood* case the disability resulted from disease of the heart and lungs. The court said not total disability but inability to labor at any gainful occupation was the test.

In *Johnson v. Mutual Trust Life Ins. Co.,* the disability was caused by pulmonary tuberculosis, and the court held it was not necessary to prove that the plaintiff would be disabled for the entire remainder of his life.

All the circumstances of a case of this kind must be considered. Plaintiff here is not illiterate. He is not

a man whose livelihood is lost by mere inability to perform manual labor. He possesses business and managerial experience. Mere inability to work with his hands could not, we think, be held to amount to total disability within the meaning of this policy. There has been no proof that his bodily infirmity is such as to entirely prevent him laboring with his hands, but even if there was such proof, this would be far from showing that he was unable to work at any gainful occupation. This it seems on principle ought to be the test. The fact that plaintiff took out a janitor's card under an assumed name is significant. He has his daily routine about his work and is able to perform it. Without a distortion of the language used in the policy it cannot be said that he is totally and permanently disabled by bodily injury or disease. The language of this disability clause is interesting and significant in the light of the facts here disclosed. The disability insured against is as to its cause such as may arise either from bodily injury or bodily disease. The insured must be disabled "totally and permanently," must be continuously and wholly prevented *thereby* from performing any work either for compensation, for gain or for profit, and from following any gainful occupation. Plaintiff appears from the evidence to be the successful manager of an apartment hotel of which he is part owner and which the evidence indicates is operated for profit. If words can be made to express ideas with any certainty it would appear this plaintiff is not "disabled" within the meaning of the disability clause of this policy. The instruction requested at the close of all the evidence should have been given. We hold as a matter of law plaintiff is not entitled to recover. The judgment will be reversed.

*Reversed.*

McSurely, P. J., and O'Connor, J., concur.