Keith G. Snelson, Plaintiff-Appellee, v. Pennsylvania Life Insurance Company, a Corporation, Defendant-Appellant.

Gen. No. 64–99.

Fifth District.

December 10, 1965.

Wagner, Conner, Ferguson, Bertrand & Baker, of East St. Louis (Bernard H. Bertrand, of counsel), for appellant.

Jones, Ottesen & Fleming, of Belleville (Ralph J. Derango, Jr., and Patrick V. Fleming, of counsel), for appellee.

MORAN, J.

Defendant, Pennsylvania Life Insurance Company, appeals from a jury verdict and judgment of the Circuit Court of St. Clair County in favor of Keith G. Snelson, plaintiff, in a suit to recover total disability benefits under an accident and health policy.

Plaintiff was 54 years of age at the time of trial. He attended school up to the seventh grade, having failed one year. He had no further education of any kind. He went to work at the age of fourteen or fifteen, doing odd jobs for his father, who was a brick contractor. He became a union bricklayer about three years later and bricklaying has been his sole source of income since then, except for a period during the war when he was an insulator for Lubrite Oil Refining Company.

On or about April 1, 1960, defendant had issued to plaintiff as the named insured, an accident and health insurance policy containing what is known as a "total disability clause." The material portions of the policy provide as follows:

> "Pennsylvania Life Insurance Co. does hereby insure the person named in the Policy Schedule (Keith G. Snelson), subject to the terms, provisions, conditions and exceptions of this policy against loss of . . . time resulting directly and independently of all other causes from accidental bodily injury sustained while this policy is in force. . . .
>
> "If 'such injury' does not result in any of the specific losses named in Part One but causes continuous total disability and total loss of time within twenty days from the date of the accident and requires regular and personal attendance by a licensed physician, surgeon, osteopath or chiropractor, other than the Insured, the Company will pay at the rate of the Monthly Benefit stated in the Policy Schedule ($200 per month) for one day or more from the first medical treatment so long as the Insured lives and is so disabled, suffers such loss of time and requires such personal attendance."

Following an accident on June 7, 1960, plaintiff made a claim under the insurance policy for total disability benefits. On the basis of such claim and medical infor-

mation supplied by the plaintiff's physicians, he was paid the total disability benefit of $200 per month for eleven months. Thereafter, as a result of medical reports submitted by plaintiff's physician and the report of an examination on May 16, 1961, by Dr. Donald O. Burst, on behalf of the insurance company, defendant discontinued the total disability payments to plaintiff.

The plaintiff testified that he was injured in June of 1960; that after treatment by medication, a surgical corset and hot baths, an operation on his back was performed in December of 1960; that he did not get any better after the operation; that six months after the operation he had pain in his back and legs; that this pain has not changed except to get worse as he gets older; that his back hurts him constantly; that his legs ache; that he has spasms and his legs pull; that the doctor gives him medicine to take care of the aching; that he takes it sometimes two or three times a day; that the medicine numbs him, takes the pain away to a certain degree and makes him drowsy.

He further testified that he was able to drive an automobile a short distance, to the store and back; that he visits friends once in a while; that he watches television; that he owns two automobiles, that his wife works; that there is one car available to him at all times and when he needs that car he uses it; that he has three used cars other than the ones he and his wife use which are located in his yard; that he is able to dress and undress himself; that he lies in a hammock and rests sometimes during the day; that he has gone to the Social Security office and to the "unemployment place" to try to get a job but was told that "he had guys in better shape than he was and that there wasn't any work for him and not to come back."

Charlotte Snelson, wife of the plaintiff testified that she does most of the work around the house, the heavy work being done by some young kids who come in; that

419

she mows the lawn, paints, washes windows, and shovels snow; that the plaintiff shuffles and limps when he walks; that he has a very hard time sitting down or getting up; that he complains to her about pain; that he takes medication two or three times a day; that his sleeping is very irregular; that the only thing he does around the house to help her is to burn trash.

Loretta Mertz, a neighbor and friend of the Snelson family, testified that she and the Snelsons have been neighbors for several years; that she has observed Mr. Snelson around the neighborhood and he appears to be a drunkard from the way he walks and he doesn't seem to be like a normal man; when he walks, he shuffles, and walks in a stooped position; when he gets up from a chair he grabs his back as if in pain and moans; when he stoops, it seems he has a hard time getting up and when he does get up, he holds onto things and grabs his back.

She further testified that she has observed Mr. Snelson from her home when he was not in a position to know that she was looking at him; that when she sees him, he is always in the same position, and when he walks, he grabs his back and walks stooped and shuffles; that he is the same morning, noon and night; that this condition has stayed the same over the past two years; that Mrs. Snelson does the painting, washing windows and shoveling of snow.

The medical evidence offered on behalf of the plaintiff consisted solely of the testimony of Dr. Bart Cole. He testified concerning his examination of the X rays, the performance of the laminectomy operation, his subsequent treatment of plaintiff following the operation, and the continuous course of treatment up to May 12, 1964, at which time the plaintiff still had objective signs of a physical disorder. He testified as to a hunchback or kyphosis and a list or scoliosis. He prescribed pain killing

420

drugs for the plaintiff throughout the course of his treatment. He further testified that in his opinion the plaintiff had suffered permanent damage to the nerve roots of L–4, L–5 and S–1; that this damage could cause a dull, constant pain which would increase upon movement. He stated that plaintiff was no longer able to do the work of a bricklayer but that "he could do sedentary things, seated at a particular job, a job where he pushes buttons, something like that."

On May 16, 1961, at defendant's request, plaintiff was examined by Dr. Donald O. Burst, an orthopedic specialist in St. Louis, Missouri, who submitted his report of examination to defendant. In summary, Dr. Burst stated that subjectively the patient complains of some headaches with some limitation in the lumbar area; that he also complains of some pain in the left leg, posteriorly, in the thigh and knee and upper portion of the calf. He found, objectively, a well-healed, nontender scar in the midline of the low back about 5½" in length with some measureable difference in the circumference of the two thighs, with the right thigh measuring ½" less than the left. He reported that the patient stated that his pains have always been on the left side and not on the right, following his injury of June 1960.

Dr. Burst, in his report, went on to say: "However, assuming all these things occurred as stated, it is now my impression and opinion that this man will be able to return to full activity by June 20, 1961, at the latest date."

Dr. Burst again, at defendant's request, examined plaintiff on May 22, 1963. In summary, Dr. Burst stated as a result of his May 22, 1963 examination of plaintiff, that he was unable to account for the man's complaints as of that examination based upon his previous difficulty and surgery. It was Dr. Burst's impression that plaintiff should be able to work as of that date. Dr. Burst stated that he believed plaintiff would have about twenty-five

percent permanent partial disability of the man as a whole as a result of his herniated intervertebral disc.

In addition to the evidence of Dr. Burst, defendant introduced evidence to demonstrate that the policy in question is what is known as a total disability policy as distinguished from an occupational disability policy.

Defendant contends that the trial court should have directed a verdict against plaintiff because the evidence established that plaintiff was not totally disabled within the meaning of the language of the policy, because it was a "total disability" policy as contrasted to a policy with an "occupational disability" clause; that the test for payment of benefits under an occupational disability policy is whether or not the insured is prevented by the injury (or sickness) from performing the usual and regular duties of his specified occupation while under a "total disability policy," the test is not whether he can perform the duties of his particular occupation but whether or not he is able to perform any work or employment for gain or profit.

Defendant further claims that the trial court erred in permitting plaintiff to introduce evidence pertaining to his usual occupation, his inability to perform the duties of same and his prior experience and educational qualifications and that giving of plaintiff's instruction No. 4 was reversible error because it improperly instructed the jury as to the burden of proof required by plaintiff.

The plaintiff contends that the policy of insurance in question is ambiguous and should have been construed against the defendant to provide benefits in the event the plaintiff was totally disabled from performing the duties of his occupation; that plaintiff may recover even under defendant's advocated construction of the policy in question, namely, as requiring total disability from performing the duties of any occupation; that defendant has waived any right to object to plaintiff's instruction No. 4 on

422

appeal since the defendant's post-trial motion did not contain any specific references to this instruction.

Defendant relies principally on the following cases to support its position: Aronson v. Mutual Life Ins. Co. of New York, 313 Ill App 35, 40, 38 NE2d 976; Sibley v. Travelers' Ins. Co. of Hartford, Connecticut, 275 Ill App 323, 331, and Buffo v. Metropolitan Life Ins. Co., 277 Ill App 366, 368.

In Aronson, the court distinguished a total disability policy from an occupational disability policy, explaining that in a total disability policy there must be proof that the insured is disabled from engaging in any occupation and performing any work for compensation or profit while in an occupational disability policy it is necessary to prove only that the insured was disabled from transacting duties pertaining to the particular occupation in which the insured is then engaged.

The court construed the policy as a total disability policy and held that the plaintiff was not entitled to recover as a matter of law because the evidence disclosed that he was not totally disabled as a matter of law within the meaning of that policy. The court pointed out that the plaintiff was the successful manager of a hotel of which he was part owner, saying at page 39:

". . . Plaintiff meets tradesmen, orders supplies such as soaps, paints, varnishes, hardware, etc., accepts deliveries of articles of merchandise, signs delivery tickets, supervises painting and decorating the building, assists in patching holes in the plaster and in doing so has carried plaster about on a piece of board and applied it to the wall with a trowel. He shellacked places in the woodwork and plaster; mixed up paint and painted the bottom part of one bathroom, a job that took him over an hour; washed walls as high as he could reach and delivered furniture about the apartment; carried paint buckets

around; collected rents and gave receipts; repairs faucets; counts linens; operates a machine for stamping the hotel linen."

The foregoing was only a partial description of plaintiff's activities in the Aronson case.

In holding that Aronson was precluded from recovering under the policy in question as a matter of law, the court said at pages 42–43:

"All of the circumstances of a case of this kind must be considered. Plaintiff here is not an illiterate. He is not a man whose livelihood is lost by mere inability to perform manual labor. He possesses business and managerial experience."

The loss of livelihood of the plaintiff in the Aronson case and of the plaintiff in the present case is quite different.

In Aronson, plaintiff was actually working at a gainful occupation while claiming total disability benefits. The plaintiff in the present case has not worked at all, even around his own home. Aronson possessed business and managerial experience while the present plaintiff is a man of limited education whose only occupation has been the performance of manual labor.

In Sibley, the policy provided "that after one full annual premium shall have been paid, if the insured will furnish the company with due proof that he has been wholly disabled by bodily injuries, or disease, and will be permanently, continuously and wholly prevented thereby for life from engaging in any occupation or employment for wage or profit, the company will waive any future premiums and make the payments agreed upon." Plaintiff contended that if the evidence showed that he was disabled so that he could not engage in the business in which he was engaged at the time of the injury which was general contracting, carpentry and concrete work, then he was totally disabled so far as the terms of the policy were concerned. In pointing out the difference be-

424

tween a "total disability policy" and an "occupational disability policy," the court held this to be a total disability policy which precluded recovery by the plaintiff, saying at page 333–334:

"An examination of the evidence disclosed that the appellee after his injuries drove his automobile on various occasions to adjoining cities, and that in November, 1931, he took his family to California in his automobile and returned to his home in Antioch, Illinois, in the same way; that he and his family stopped at different camps en route and while in California he drove his car to various places on business trips and amusement; that he is a member of the board of trustees of the Village of Antioch and attends the various meetings for the transaction of business that comes before said board; that he remains at these meetings a considerable length of time. He attends social gatherings, picnics, theaters, and plays bridge for extended periods, and at some of the entertainments, dances with his wife and other acquaintances. He makes frequent visits to his friends around his home and goes down town on business and to the post office regularly. He visits the various stores and performs errands while he is down town. He makes trips by automobile and elevated train to his physician in the City of Chicago unassisted. On some of these trips he walks up the stairs to the elevated station and is away from home practically the whole of the day. He drives his car to the City of Chicago, puts it into a garage and drives back home unassisted and does other chores around his home. From this evidence we are of the opinion that the plaintiff has not proved that he is totally and permanently, wholly disabled, by bodily injuries or disease, nor that he had become permanently and wholly prevented thereby from engaging in the business of general contractor, carpenter, con-

425

crete and superintendent and working therein, and thereon as claimed in the declaration."

From the foregoing it is apparent that Sibley was capable of earning a living, but this is not true of the present plaintiff.

In Buffo, the court construed the clause in question to be a total disability clause and not an occupational disability clause, saying at page 369:

> "An examination of the record in this case discloses without controversy that the appellee confined his proof solely to that of demonstrating he was unable to perform the duties incident and necessary to that of the wholesale and retail fruit and vegetable business. There is no attempt made to show any inability to engage in any other occupation or from performing any other work for compensation or profit. Under such state of facts this court is of the opinion that appellee has not proven he is totally and permanently disabled by the alleged injury so as to be prevented from engaging in any occupation and performing any work for compensation or profit, in accordance with the terms of the policy."

In Buffo, the plaintiff did not even claim that he could not do work other than that of his principal occupation. The present plaintiff claims he is totally disabled.

Plaintiff relies principally on the case of Missouri State Life Ins. Co. v. Copas, 265 Ill App 478. The plaintiff in that case was a coal miner whose experience was limited to manual labor. He was disabled from performing manual labor, and sought recovery of disability benefits under a policy which provided benefits if the insured was "totally and permanently disabled by bodily injury and disease, and wholly prevented thereby from engaging in any gainful occupation." The defendant insurance company appealed from a verdict judgment in favor of the plaintiff and contended that the plaintiff had to prove

that he was totally and permanently disabled for every purpose before he could recover on the policy in question. The Appellate Court rejected this contention even under the clear and strict liability provision involved in that case, saying at page 483:

"This is not the law. In Taylor v. Southern State Life Ins. Co., 106 SC 356, 91 SE 326, LRA 1917C, page 911, the court said:

" 'An illiterate three-horse farmer, dependent in large measure on his own strong arm for livelihood, accustomed and trained only to bodily labor, made by disease suddenly and generally unfit for bodily labor, comes within the meaning of the contract; he is deemed totally disabled when he is no longer able to do his accustomed task, or such work as he has only been trained to do, and upon which he must depend for a living. A man of waning years, of small means, of no education, totally dependent upon the strength of his body for a livelihood, is bankrupt when the marvelous and mysterious parts of his organism go wrong.' "

The court in that case sustained the finding of the jury as not against the manifest weight of the evidence.

We believe that Missouri State Life Ins. Co. v. Copas, supra, is in accord with the vast weight of judicial authority throughout the United States. In 29-A, Am Jur, Insurance, Par 1518, the following language appears at pages 622-23:

"In the case of a 'general disability' policy, the courts are in conflict as to the type of work which the insured must be unable to perform in order to be totally disabled within the meaning of the policy. Some courts refuse to distinguish between policies which relate specifically to disability in respect to

a particular occupation and those which undertake to insure against disability from performing any sort of remunerative labor, holding that total disability occurs in either case if the insured becomes unable to perform the duties of, or labor pertaining to, his particular occupation. According to the rule, recovery will not be prevented by the fact that the insured is able to perform all the substantial and material acts of some other business or occupation. At the other extreme, there is authority for the view that an insured person may not be regarded as totally disabled within a 'general disability' clause until he is unable to follow any occupation whatsoever. Under this theory the liability of the insurer does not extend to cases where the insured is still capable of engaging in some occupation for profit. A majority of the courts, however, take the middle ground that it is not sufficient, in order to recover under the 'general disability' clause, that the insured is disabled only from engaging in his usual business or occupation, but that he must also be unable to engage in any comparable occupation or employment for which he is fitted by education, experience, and physical condition. These cases proceed upon the theory that the term 'total disability' as used in general disability clauses is a relative one depending in a large measure upon the character of the occupation or employment and the capabilities of the insured, and upon the circumstances of the particular case. While under this rule it is not sufficient, in order to recover under the disability clause, that the insured is disabled from engaging in his usual business or occupation, he need not be disabled from following any occupation whatsoever regardless of its character."

Defendant asks us to adopt one of the extreme authorities by urging that plaintiff is not totally disabled

as long as he is able to follow any occupation whatsoever. In Foglesong v. Modern Brotherhood, 121 Mo App 548, 97 SW 240, the court rejected this extreme position and said at page 241 of the Southwestern Reporter:

"We are unwilling to adopt such a doctrine, the effect of which would be, practically, to reduce all such contracts to nullities, and to make them the instruments of extracting dues from policy holders without creating any liability on the part of the insurers. Common knowledge of the occupations in the lives of men and women teach us that there is scarcely any kind of disability that prevents them from following some vocation or other, except in cases of complete mental inertia. We have examples of persons without hearing and without sight following a vocation—some without feet, and some without hands, engaged in business. The achievements of disabled persons are seemingly marvelous. Under defendant's theory, the plaintiff might embark in the peanut trade or follow the business of selling shoe strings or lead pencils, or follow some similar calling; in which instances, under the rule invoked, there would be no disability within the meaning of the policy. In our opinion, such was not within the contemplation of the parties. In order to carry out the intent of the parties, it is our duty to disregard the broad language used which would have the effect to defeat the purpose of the contract and render it a nullity."

■■ We also reject this extreme position and hold that when a man is no longer able to do his accustomed task and such work as he has only been trained to do, and upon which he must depend for a living, he is totally disabled within the meaning of the policy in question. The jury found Snelson to be such a man. There was ample evidence to support its finding.

Defendants argue that because plaintiff's doctor said that he could do some kind of sedentary work such as being seated at a particular job where he pushes buttons, he is not totally disabled. Under this test it is hard to visualize anyone, other than a blind person, who would be totally disabled within the meaning of this policy.

The question of whether or not the plaintiff was totally disabled from engaging in his regular occupation or some other, was a question of fact for the jury and if there is any evidence to sustain the jury's verdict, it will not be disturbed. Since there was sufficient evidence to support the essential elements of the plaintiff's case and present a question of fact for the jury even though the policy in question be construed as a total disability policy, we find it unnecessary to decide whether or not this particular policy is what is known as a total disability policy or an occupational disability policy. Missouri State Life Ins. Co. v. Copas, supra; Davis v. Midland Cas. Co., 190 Ill App 338. The jury answered "no" to the following interrogatory submitted by the defendant: "Is the plaintiff able to do, perform or direct any kind of labor or business for remuneration or profit?"

We will not review defendant's objection to plaintiff's instruction No. 4 because objection was not made to this instruction in defendant's post-trial motion. Chapter 110, § 68.1(2), Ill Rev Stats 1963, provides in part as follows: "A party may not urge as error on review of the ruling on his post trial motion any point, ground or relief not particularly specified in the motion." Objections to instructions will not be considered on review if not specifically set forth in the objecting party's post-trial motion. Amenda v. Suits, 8 Ill2d 598, 134 NE2d 811.

The cases cited by both parties commented upon evidence being introduced concerning all of the circumstances involved which included evidence of the educational background and experience of the party involved

in addition to his physical incapacity. We therefore find that defendant's contention that the introduction of evidence concerning plaintiff's educational background and business experience was reversible error is without merit.

For the foregoing reasons the judgment of the Circuit Court of St. Clair County in favor of the plaintiff and against the defendant is affirmed.

Judgment affirmed.

EBERSPACHER, P. J. and WRIGHT, J., concur.